UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

TOTAL90, LLC                                        CIVIL ACTION

VERSUS                                              NO. 25-2325

NIKE, INC.                                          SECTION: D(3)

**REASONS FOR ORDER**

Before the Court is a Motion for Preliminary Injunction filed by Plaintiff/Counter-Defendant Total90, LLC ("T90").[1] Defendant/Counter-Plaintiff Nike, Inc. ("Nike") has filed a Response in Opposition.[2] Plaintiff has filed a Reply.[3] On January 8, 2026, the Court held an evidentiary hearing and oral argument on the motion.[4] Following the hearing, the Court ordered supplemental briefing.[5] Each party filed a memorandum.[6] After careful consideration of the parties' briefing, oral arguments, the evidence presented, the record, and the applicable law, the Court **DENIED** the Motion for Preliminary Injunction during a telephone status conference and advised that written reasons for the Order would follow.[7] These written Reasons for Order follow.

---

[1] R. Doc. 2. While the Motion is styled as Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction, the Court has already ruled on the motion as it relates to a Temporary Restraining Order. *See* R. Doc. 21.

[2] R. Doc. 4.

[3] R. Doc. 10.

[4] R. Doc. 41.

[5] R. Doc. 40.

[6] R. Docs. 42 and 43.

[7] *See* R. Doc. 50.

## I.    FACTUAL AND PROCEDURAL BACKGROUND[8]

This case arises out of a dispute over the trademark "Total 90."[9] In 2000, Nike, a global purveyor of athletic goods, introduced its brand "Total 90," which consisted of a line of soccer products, including cleats and jerseys.[10] Throughout the 2000s, Nike released a series of products in the Total 90 line of products, for which it possessed the trademark "Total 90." Nike, however, allowed its registration of its "Total 90" trademark to lapse in April 2019. A little less than three years later, in February 2022, Total90, LLC filed trademark applications for the phrase "Total90" which registration was issued in September 2024.[11]

Total90, LLC, ("Plaintiff") filed suit against Nike, Inc. ("Defendant") on November 14, 2025 alleging that Defendant continued to use the Total 90 trademark in interstate commerce in connection with the sale of Nike shoes.[12] That same day, the Plaintiff filed a Motion for Temporary Restraining Order and Preliminary Injunction.[13] In that motion, the Plaintiff argues that it is likely to succeed on the merits since it holds valid federal registrations for the trademark which the Defendant abandoned and the Defendant's reintroduction of use in 2025 cannot revive the Defendant's rights.[14] Addressing the irreparable harm prong necessary for an injunction, the Plaintiff contends that "without a TRO, Nike's marketing blitz will

---

[8] The Court detailed the factual and procedural background of the case in its Order and Reasons on the Motion for Temporary Restraining Order (R. Doc. 21), which it incorporates here by reference.
[9] R. Doc. 1
[10] The parties stipulated to this timeline during the hearing on the present motion. *See* R. Doc. 39 at pp. 5-6.
[11] R. Doc. 1.
[12] *Id.*
[13] R. Doc. 2.
[14] *Id.*

continue diverting customers, eroding brand equity, and destroying Plaintiff's reputation built over six years," which harms are not compensable by money damages alone.[15] The Plaintiff summarily argued that the balance of equities and public interest factors also weighed in its favor.[16] After considering the briefing by the parties as well as the exhibits provided, the Court denied the Motion for Temporary Restraining Order.[17] Plaintiff's Motion for Preliminary Injunction was thereafter set for a hearing.

That hearing was held on January 8, 2026.[18] Plaintiff called Coach Hugh Bartlett, CEO and Founder of Total90, LLC, to testify, and the Defendant called Agra Diapari, Senior Director of Footwear Product Management of Nike Sportswear Icons, at Nike, Inc.[19] Both parties entered physical exhibits into evidence. Following the hearing, the Court requested supplemental briefing on two issues: under the Lanham Act as applied to this case, (1) what type of use constitutes "use in commerce" and (2) how much use constitutes "continuous use."[20] The parties timely filed supplemental memoranda.[21]

The Plaintiff contends that it holds valid United States Trademark Registrations for the mark "Total90," "covering apparel, footwear, and digital entertainment services related to soccer" and began using the mark in commerce in

---

[15] *Id.*
[16] *Id.*
[17] R. Doc. 21.
[18] R. Doc. 41.
[19] *See* R. Docs. 39, 41.
[20] R. Doc. 40.
[21] R. Docs. 42 and 43.

January 2022.[22] It claims that the Defendant, which had previously owned registrations for the "Total 90" mark, abandoned its registration in 2019 and then reintroduced products using the mark in March 2025.[23] The Plaintiff argues that "Nike's relaunch has caused actual marketplace confusion, reverse confusion, and dilution of Plaintiff's mark" and constitutes trademark infringement, false designation of origin, as well as violations of state laws, including the Louisiana Unfair Trade Practices Act and state trademark infringement.[24] The Plaintiff maintains that all four factors for a preliminary injunction are met because (1) it is substantially likely to succeed on its claim of trademark infringement based on reverse confusion, (2) the "loss of control over one's trademark and the resulting injury to goodwill constitute irreparable harm per se under the Lanham Act," (3) the balance of equities strongly favors Total90, and (4) "[p]reventing consumer confusion and protecting legitimate trademark rights serves the public interest."[25]

The Defendant counters that the Plaintiff has not established any of the factors necessary for the issuance of a preliminary injunction.[26] First, the Defendant argues that Plaintiff has failed to show a likelihood of success on the merits.[27] The Defendant supports this argument by explaining that the Plaintiff has the burden of showing that it is the "senior user" of the mark and that the Plaintiff has failed to carry that burden.[28] The Defendant advises that the Plaintiff's motion "overlooks U.S.

---

[22] R. Doc. 2 at p. 2.
[23] *Id.*
[24] *Id.*
[25] *Id.* at pp. 3-5.
[26] R. Doc. 4.
[27] *Id.*
[28] *Id.*

trademark law's fundamental axiom: that it is priority of use, not registration, that gives an entity rights to a trademark."[29] While the Defendant acknowledges that it let the Total 90 trademark lapse in the U.S., it contests the Plaintiff's assertion that it "abandoned" its trademark, arguing that the trademark is abandoned only: "(i) when its use has been discontinued with intent not to resume such use; or (ii) when conduct of the owner 'causes the mark to become the generic name for the goods or services.'"[30] In further support of its argument that the Plaintiff has failed to show a likelihood of success on the merits, the Defendant claims that the Plaintiff has not acknowledged or addressed the Fifth Circuit standard to establish a likelihood of confusion, nor has the Plaintiff met its burden in this regard, as the Plaintiff "comes to this Court with only the conclusory statement that the instant matter is a 'classic reverse confusion scenario.'"[31] The Defendant emphasizes that the Plaintiff has not demonstrated a substantial threat of irreparable injury, as the Trademark Modernization Act's presumption of irreparable harm does not apply because a substantial likelihood of success on the merits has not been shown.[32] Further, the Defendant contends that the presumption of irreparable harm is rebutted by Plaintiff's "unreasonable fifteen-month delay in seeking emergency injunctive relief."[33] Additionally, the Defendant notes that the Plaintiff has demonstrated that

---

[29] *Id.* Defendant further contends that Plaintiff's "fraudulently obtained registration will be proven invalid and is now subject to a cancellation proceeding" before the Trademark Appeal Board.

[30] R. Doc. 4, quoting 15 U.S.C. § 1127.

[31] R.Doc. 4.

[32] *Id.* at p. 16.

[33] *Id.* Defendant further maintains that, during that time period, "Plaintiff spent nine months unsuccessfully trying to extract a windfall from Nike, before finally following through on its threat to file the instant motion."

it believes that monetary damages would compensate for any injury from the Defendant's alleged infringement, obviating the need for an injunction.[34]

Next, the Defendant contends that the Plaintiff has also failed to show that the balance of equities weighs in favor of an injunction as the Plaintiff has not demonstrated that its interest would outweigh the damage that an injunction would cause Defendant.[35] As to the fourth preliminary injunction factor, the Defendant argues that "[i]t would not be in the public interest to grant a motion that would endorse Plaintiff's attempt to manipulate and exploit the judicial system for this improper purpose" and because the Plaintiff has failed to show that an injunction would protect "legitimate trademark interests."[36] Lastly, the Defendant contends that, should the Court grant a preliminary injunction, that the Plaintiff be required to post a bond of no less than $20 million due to the material hardships that the Defendant claims it would suffer from a wrongly-entered injunction.[37]

The Plaintiff replies that this case presents a "straightforward abandonment analysis under the Lanham Act" and the evidence the Defendant presents "demonstrates only past fame, not ongoing use in commerce."[38] Furthermore, it contends that "[o]nce a mark is abandoned, priority passes to the first bona fide adopter," in this case, being Plaintiff.[39] Addressing the likelihood of confusion factors for the first time, the Plaintiff states that "the relevant factors strongly favor Plaintiff

---

[34] *Id.* at pp. 18-19.
[35] *Id.* at pp. 19-20.
[36] *Id.* at p. 22.
[37] *Id.* at p. 23.
[38] R. Doc. 10 at p. 2.
[39] *Id.* at p. 3. Plaintiff does not cite any authority for this statement.

and reinforce the likelihood of reverse confusion" because "channels of trade and purchasing demographics materially intersect, as both parties sell athletic products online and through general retail outlets to similar consumers."[40]

Regarding actual confusion, the Plaintiff claims that there has been actual confusion but that "[t]he absence of extensive actual confusion at this early stage is unsurprising where the junior user's marketing is new and dominant."[41] Plaintiff contends that it will suffer irreparable harm should the Court not enjoin the Defendant because the Defendant's use of the mark threatens to displace the Plaintiff from the market and that the earlier settlement discussions between itself and the Defendant "do not negate irreparable harm; they demonstrate diligence and an effort to avoid litigation."[42] Lastly, the Plaintiff reiterates that the balance of equities favors it because "faces immediate loss of control over its brand identity and significant marketplace displacement" and that an injunction would advance the public interest by preventing consumer confusion and preserving the integrity of the trademark system.[43]

## II.    LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy."[44] To secure a preliminary injunction, the movant must establish:

(1) a substantial likelihood of success on the merits,

---

[40] *Id.*
[41] *Id.*
[42] *Id.* at p. 4. Plaintiff also contends that the Court should disregard any argument or information regarding the earlier settlement discussions between the parties for a number of reasons, including that "the record reflects nothing more than ordinary compromise negotiations."
[43] *Id.* at pp. 4-5.
[44] *Atchafalaya Basinkeeper v. United States Army Corps of Eng'rs*, 894 F.3d 692, 696 (5th Cir. 2018).

(2) a substantial threat of irreparable injury if the injunction is not issued,
(3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and
(4) that the grant of an injunction will not disserve the public interest.[45]

The party requesting an injunction "bear[s] the burden of showing that they satisfy each of these elements."[46] Because a preliminary injunction is an extraordinary remedy, a court should not grant one "unless the party seeking it has 'clearly carried the burden of persuasion' on all four requirements."[47] Additionally, the party requesting the temporary restraining order must provide "security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."[48]

The Court proceeds to an analysis of each of the elements of a preliminary injunction.

## III.   ANALYSIS

### 1. Substantial Likelihood of Success on the Merits

To determine whether the Plaintiff has demonstrated a substantial likelihood of success on the merits of its trademark infringement claim, the Court must first establish if the Plaintiff has demonstrated a substantial likelihood of proving that it is the senior user of the mark. The Plaintiff must then show a likelihood of confusion

---

[45] *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011) (quoting *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009)).
[46] *Perez v. City of San Antonio*, No. 23-50746, 2025 WL 3559986, at *17 (5th Cir. Dec. 12, 2025).
[47] *Bluefield Water Ass'n, Inc. v. City of Starkville, Miss.*, 577 F.3d 250, 253 (5th Cir. 2009) (quoting *Lake Charles Diesel, Inc. v. Gen. Motors Corp.*, 328 F.3d 192, 195–96 (5th Cir.2003)).
[48] Fed. R. Civ. P. 65(c).

between its mark and that of the Defendant.[49] Finally, the Plaintiff must show that the likelihood of confusion will actually cause it irreparable injury for which there is no adequate legal remedy.[50] In its analysis of likelihood of success on the merits for the purpose of a preliminary injunction, the Court will first analyze the mark users' relative seniority and then address the claim of infringement.

### a. The Senior User of the Mark

The Plaintiff argues that it is the senior user of the mark because it owns the trademark registrations for "Total90" covering apparel, footwear, and digital entertainment services related to soccer.[51] While acknowledging that the Defendant previously owned the trademark, the Plaintiff contends that it is the senior user of the mark because the Defendant's "Total 90" mark was canceled for nonuse in 2019 and had not been used again by the Defendant until 2025.[52] The Plaintiff states that Defendant cannot identify any "bona fide sales, shipments, advertising campaigns, retail distribution or inventory" of Total 90 goods in the decade preceding the 2024 relaunch of Total 90 products.[53] The Plaintiff contends that, because the Defendant abandoned the mark, priority of use of the mark would pass to the first bona fide

---

[49] *Union Nat. Bank of Texas, Laredo, Tex. v. Union Nat. Bank of Texas, Austin, Tex.*, 909 F.2d 839, 844 (5th Cir. 1990) ("A party seeking an injunction for trademark infringement must clear several hurdles in order to prevail. First, he must prove that the name he seeks to protect is eligible for protection. He must then prove he is the senior user. Having proven these elements he must then show a likelihood of confusion between his mark and that of the defendant. Finally, because he's asking for the equitable remedy of an injunction, he must show that the likelihood of confusion will actually cause him irreparable injury for which there is no adequate legal remedy.").

[50] *Id.*

[51] R. Doc. 2 at ¶ 1.

[52] *Id.* at p. 4.

[53] R. Doc. 10 at p. 2.

adopter, namely, Plaintiff.[54] Defendant Nike disagrees with Plaintiff Total90's characterization of the facts. The Defendant argues that it never abandoned the mark and that it has continuously used the "Total 90" mark for "almost three decades," having "never intended to stop using the mark."[55] As such, the Defendant claims that it "has longstanding priority in TOTAL 90 over Plaintiff" and that "Plaintiff cannot establish ownership of a legally protectable mark."[56]

"Ownership of trademarks is established by use, not by registration."[57] "The first one to use a mark is generally held to be the 'senior' user."[58] The senior user of a mark "is entitled to enjoin other 'junior' users from using the mark, or one that is deceptively similar to it."[59] However, the senior user "may not enjoin others from using the mark if the likelihood of confusion between his product and the infringer's is minimal or non-existent."[60]

Under the Lanham Act, a mark is considered to be abandoned either "(1) [w]hen its use has been discontinued with intent not to resume such use" or "(2) [w]hen any course of conduct of the owner, including acts of omission as well as commission, causes the mark to become the generic name for the goods or services on or in connection with which it is used or otherwise to lose its significance as a mark."[61]

---

[54] *Id.* at p. 3.
[55] R. Doc. 4 at pp. 12-13.
[56] *Id.* at p. 13.
[57] *Id.* at 842; *see also* 2 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 16:1.50 (5th ed. 2026) ("it is not registration, but only actual use of a designation as a mark that creates rights and priority over others.").
[58] *Id.*
[59] *Id.* at 842-43.
[60] *Id.* at 843.
[61] 15 U.S.C. § 1127.

Under the statute, "[n]onuse for 3 consecutive years shall be prima facie evidence of abandonment," and "'[u]se' of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark."[62] Such use equates to "use in commerce."[63] "The burden of proof is on the party claiming abandonment."[64]

The Plaintiff's argument that it is the senior user turns on whether it can demonstrate that the Defendant abandoned and failed to use the Total 90 mark as the seniority of users of the mark is determined by their usage of the mark, not registration of the mark. Plaintiff argues that the presumption of abandonment due to nonuse for three consecutive years applies to this case and that such period began in 2019.[65] Plaintiff contends that the evidence of usage during this 3-year period to which the Defendant refers merely consists of "sporadic and token uses," which is "not real use" under the Lanham Act.[66] The Defendant responds that "token use" as a legal doctrine in trademark jurisprudence applies "when somebody is trying to obtain rights to a trademark in the first place" and that, in a discussion of whether

---

[62] *Id.*

[63] *Perry v. H. J. Heinz Co. Brands, L.L.C.,* 994 F.3d 466, 474 (5th Cir. 2021); see also *Action Ink, Inc. v. New York Jets, LLC*, No. CV 12-46, 2013 WL 12106878, at *4 (E.D. La. June 20, 2013), *adhered to on denial of reconsideration,* No. CV 12-46, 2013 WL 5532781 (E.D. La. Oct. 4, 2013), *aff'd sub nom. Action Ink, Inc. v. New York Jets, L.L.C.,* 576 F. App'x 321 (5th Cir. 2014) ("'Use' for abandonment purposes is equivalent to 'use in commerce' under 15 U.S.C. § 1127.").

[64] *Vais Arms, Inc. v. Vais*, 383 F.3d 287, 293 (5th Cir. 2004).

[65] R. Doc. 39 at p. 65 ("THE COURT: So I want to go back to my question. What are the three years of nonuse that you are relying on? MR. BRADLEY: Starting in 2019.").

[66] *Id.* at p. 62.

an entity abandoned a trademark, "even a single instance of use is sufficient against a claim of abandonment if such use is made in good faith."[67]

The Fifth Circuit explicitly adopted such a rule in *Perry v. H. J. Heinz Co. Brands, L.L.C.*, in which it held that "[a]bandonment generally requires a complete discontinuance of the trademark's use and even minor or sporadic good faith uses of a mark will defeat the defense of abandonment."[68] During the hearing on this motion, Agra Diapari, Senior Director of Footwear Product Management of Nike Sportswear Icons, testified that Defendant has never stopped using the Total 90 brand in the marketplace,[69] and his affidavit enumerates several instances of use of the Total 90 mark between 2019, the year in which Plaintiff claims Defendant abandoned the mark, and the present, including releasing Total 90 soccer balls, a type of Total 90 cleat, and a line of Total 90 clothing.[70] The witness further testified that Nike never stopped using the Total 90 brand in the marketplace since its introduction in 2000.[71] The Court found the witness credible, and nothing in the record disputed his testimony.

Plaintiff relies on the Fifth Circuit's holding in *Exxon Corp. v. Humble Exploration Co., Inc.*, that "seemingly similar sporadic and *de minimis* use could serve as grounds for registration cancellation" and argues that this sporadic or "token" usage of the mark does not constitute "use in commerce" under the Lanham

---

[67] *Id*. at pp. 82-83 (quoting *Electro Source, LLC v. Brandess–Kalt–Aetna Group, Inc.*, 458 F.3d 931, 938 (9th Cir. 2006)).
[68] 994 F.3d 466, 475.
[69] R. Doc. 39 at p. 37
[70] R. Doc. 4-2 at ¶¶ 20-24. He further brought as an exhibit a soccer cleat with the Total 90 brand which was developed and designed by his team in 2023.
[71] R. Doc. 39 at p. 39.

Act.[72] However, in *Perry*, the Fifth Circuit distinguished *Humble* as applicable "in the context of a trademark maintenance program," in which a company makes "only token or sporadic use of its" mark "to reserve rights to the trademark."[73] The slightest cessation of use does not cause "a trademark to roll free, like a fumbled football, so that it may be pounced on by any alert opponent."[74] "Intermittent periods of nonuse or low level use do not result in abandonment if the business is more or less continuous."[75] The Plaintiff has failed to show that any intermittent period of nonuse or low level use by the Defendant was coupled with the intent not to resume such use. The Court further finds that the Plaintiff has not proven that the Defendant's usage of the "Total 90" mark was part of a trademark maintenance program, consisting of only token or sporadic use meant to reserve rights in the mark at issue.

Plaintiff Total90 here has a "heavy burden" in order to demonstrate that Defendant Nike abandoned the mark and in "the absence of definitive proof of a trademark maintenance program like the one in *Humble*," that burden has not been met.[76] Based on the record evidence from the Defendant through Diapari's affidavit and testimony, along with the exhibits submitted by both parties, the Court finds that the Plaintiff has not met this burden to demonstrate the Defendant's

---

[72] *Perry*, 994 F. 3d at 475 (citing *Exxon Corp. v. Humble Exploration Co., Inc.*, 695 F.2d 96 (5th Cir. 1983)); R. Doc. 42 at p. 2.
[73] *Id.*
[74] 2 McCarthy § 17:14 (5th ed.) (quoting *Continental Distilling Corp. v. Old Charter Distillery Co.*, 188 F.2d 614, 619, 87 U.S.P.Q. 365 (D.C. Cir. 1950)).
[75] *Id.* (quoting *Interstate Brands Corp. v. Way Baking Co.*, 403 Mich. 479, 483, 270 N.W.2d 103, 105–06 (1978)).
[76] *Perry*, 994 F.3d at 476.

abandonment of the mark and thus that it, and not the Defendant, is the senior user of the mark.[77]

Furthermore, the statutory presumption of abandonment after three consecutive years of non-use is just that—a presumption. Even if the Court had found that Plaintiff had made a showing that it was likely to succeed in demonstrating that the Defendant had not used the mark for three consecutive years, the Defendant could rebut such a presumption with evidence evincing an intent to resume such use.[78] The record evidence cited above directly rebuts that presumption.[79]

In sum, Court finds that Plaintiff Total90, LLC, has not carried its burden of a substantial likelihood of success in showing that it is the senior user of the mark, a requirement to enjoin other users from using the mark.[80] Since the Court has determined that the Plaintiff has failed to carry its burden to show that it was the senior user of the mark, the Court need not address whether the Plaintiff carried its burden of showing a substantial likelihood of confusion between its mark and Defendant's mark. However, even if the Plaintiff had shown a substantial likelihood of success that it was the senior user of the "Total 90" mark, the Court also finds that the Plaintiff has not met its burden of demonstrating a substantial likelihood of

---

[77] To the extent that Total90 argues that the United States Supreme Court's decision in *Abitron Austria GmbH v. Hetronic Int'l, Inc.* requires courts to consider only domestic use of a mark when assessing "use in commerce" under the Lanham Act, the Court does not consider any of Nike's arguments regarding the usage or maintenance of the "Total 90" mark in foreign jurisdictions in its decision on the present motion. 600 U.S. 412, 143 S. Ct. 2522, 216 L. Ed. 2d 1013 (2023).

[78] *See* 15 U.S.C. § 1127.

[79] *See supra* n. 60-61.

[80] *Romac Env't Servs. LLC v. Wildcat Fluids LLC*, No. 6:20-CV-00581 LEAD, 2022 WL 421416, at *4 (W.D. La. Feb. 10, 2022) (citing *Union Nat. Bank of Tex., Laredo, Tex. v. Union Nat. Bank of Tex., Austin, Tex.*, 909 F.2d 839, 844–45 (5th Cir. 1990)).

success regarding the claim of trademark infringement, which also requires a showing of confusion.

### b. Trademark Infringement

To prevail on a claim of trademark infringement under the Lanham Act, the plaintiff must show that (1) it possesses a legally protectable trademark and (2) [the defendant's] use of this trademark 'creates a likelihood of confusion as to source, affiliation, or sponsorship.'"[81] For a party to have a legally protectable trademark, it must be either inherently distinctive or must acquire distinctiveness through a secondary meaning; "[r]egistration of a mark with the PTO is 'prima facie evidence that the mark[ ] [is] inherently distinctive.'"[82] To determine whether a likelihood of confusion has occurred, a court must consider:

> (1) the type of trademark; (2) mark similarity; (3) product similarity; (4) outlet and purchaser identity; (5) advertising media identity; (6) defendant's intent; (7) actual confusion; and (8) care exercised by potential purchasers.[83]

These "digits of confusion" are not exhaustive, and "a finding of a likelihood of confusion does not even require a positive finding on a majority" of these digits to find that a likelihood of confusion exists.[84] While not required, the seventh digit, actual confusion, constitutes the "best evidence of a likelihood of confusion."[85]

---

[81] *Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*, 851 F.3d 440, 450 (5th Cir. 2017) (quoting *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015)).
[82] *Id.*
[83] *Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, 576 F.3d 221, 227 (5th Cir. 2009)
[84] *Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 194 (5th Cir. 1998).
[85] *Future Proof Brands, L.L.C. v. Molson Coors Beverage Co.*, 982 F.3d 280, 289 (5th Cir. 2020).

15

The "type of trademark" "refers to the strength of the senior mark."[86] "Stronger marks are entitled to greater protection."[87] Two factors are analyzed when determining the strength of a mark: "(1) the mark's position along the distinctiveness spectrum, and (2) the standing of the mark in the marketplace."[88] The Court finds that based on the evidence in the record regarding the usage of the "Total 90" mark over time, as well as the identification of the mark "Total 90" as "iconic" by witnesses for both the Plaintiff and the Defendant,[89] that the mark is a strong mark and therefore is entitled to greater protection. Since the Plaintiff failed to carry its burden to show that it is the senior user, this factor is neutral.

As to mark similarity, "[t]he degree of similarity between marks is determined by comparing the marks' appearance, sound, and meaning."[90] "Similarity of appearance is determined on the basis of the total effect of the designation, rather than on a comparison of individual features" and "courts should give more attention to the dominant features of a mark."[91] Here, the Court finds that there is a likelihood of success in showing that the "Total90" and "Total 90" marks are similar based on this test and thus the Court finds that this digit weighs in favor of a finding of a likelihood of confusion.

---

[86] *Xtreme Lashes, LLC*, 576 F.3d at 227.

[87] *Id.*

[88] *Rex Real Est. I, L.P. v. Rex Real Est. Exch., Inc.*, 80 F.4th 607, 621 (5th Cir. 2023).

[89] The Court notes that the word "iconic" appears sixteen times in the hearing transcript and that each party's witness identified the "Total 90" mark as iconic. *See* R. Doc. 39.

[90] *Id.* at 621–22 (quoting *Elvis Presley Enters., Inc.*, 141 F.3d at 201) (internal quotations omitted).

[91] *Xtreme Lashes, LLC*, 576 F.3d at 228.

The next digit is product similarity. "The greater the similarity between the products and services, the greater the likelihood of confusion."[92] Here, the products are relatively similar. Both the Plaintiff and the Defendant produce soccer balls and other equipment for soccer. While there was no evidence presented that the Plaintiff produces lifestyle shoes similar to the Defendant's, the soccer equipment produced is relatively similar. The Plaintiff, however, uses the mark on a fantasy soccer app, a product different from any that the Defendant produces.[93] The Court finds that this digit is, at most, neutral regarding the Plaintiff's ability to make a showing of a likelihood of confusion on this digit.

As to the digit regarding the identity of retail outlets and of purchasers, "[d]issimilarities between the retail outlets for and the predominant consumers of plaintiff's and defendant's goods lessen the possibility of confusion, mistake, or deception." [94] Defendant has noted that "Plaintiff did not provide evidence of the same or similar retail outlets as Nike."[95] The Court agrees. While there is evidence that both parties' products appeal to a similar group of consumers interested in the sport of soccer, which creates "an identity of purchasers," there is "a substantial difference in the nature of the parties' retail outlets."[96] The fact that both parties use the Internet for sales is insufficient standing alone to support a finding of likelihood of

---

[92] *Exxon Corp. v. Texas Motor Exch. of Houston, Inc.*, 628 F.2d 500, 505 (5th Cir. 1980).

[93] *See* R. Doc. 39 at pp. 10-11.

[94] *Exxon Corp.*, 628 F.2d at 505.

[95] R. Doc. 39 at pp. 86-87.

[96] *Exxon Corp.*, 628 F.2d at 505.

17

confusion.[97] After analyzing the little evidence regarding the identity of retail outlets and of purchasers, the Court finds that evidence in the record does not support a showing of a likelihood of confusion.

Next, as to the identity of advertising media, courts in this circuit look to "the similarity between the parties' advertising campaigns. The greater the similarity in the campaigns, the greater the likelihood of confusion."[98] There is very little evidence in the record regarding the identity of advertising media. Plaintiff presented evidence that it used the mark to sponsor a youth soccer club in Brazil, the Louisiana Fire club soccer team in New Orleans, and the Louisiana State University men's club soccer team.[99] Defendant presented evidence regarding its national television advertisements, social media campaigns, and Internet advertisements.[100] Based on the minimal evidence in the record, the evidence does not reflect a great similarity between the identity of the advertising media used by the parties. The record supports that the Defendant has far wider and broader advertising than the Plaintiff. The Court finds that Plaintiff has not demonstrated a likelihood of confusion as to this digit.

Regarding the Defendant's intent, courts look to "whether the defendant intended to derive benefits from the reputation of the plaintiff"[101] Here, the Plaintiff has provided no such evidence that the Defendant intended to "palm off" its goods as

---

[97] *Dallas Cowboys Football Club, Ltd. v. Am.'s Team Props., Inc.*, 616 F. Supp. 2d 622, 639 (N.D. Tex. 2009) ("'The Internet' is simply too broad to assert complete overlap of retail outlets; it is akin to saying 'stores' or 'distributors.'").
[98] *Rex*, 80 F.4th at 623 (internal quotations omitted) (citation modified).
[99] *See e.g.,* R. Doc. 39 at pp. 18-19.
[100] *See* R. Doc. 4-2, *Declaration of Agra Diapari.*
[101] *Future Proof Brands, L.L.C.*, 982 F.3d at 296 (5th Cir. 2020).

the Plaintiff's goods. [102] The Court finds that Plaintiff's failure to provide any evidence as to this digit fails to support a finding of a likelihood of confusion.

Regarding the actual confusion digit, the Plaintiff's Founder and CEO Bartlett testified that "last night a bunch of parents came up to me and asked if I was working with Nike. I kind of chuckled and said, 'Actually, we are in the middle of a lawsuit right now.'" [103] He further testified that the parents mentioned that they were confused because "[t]hey were in a store and they saw soccer balls and jerseys with Total 90 on them and just assumed we were working together." [104] The Defendant argues, however, that while "evidence of actual confusion is one of the best types of confusion, it is very clear that that rule applies only if the evidence of actual confusion is relatively significant." [105] The Court agrees with the Defendant. This isolated incident, which lacks corroborating evidence, is not enough of a showing to demonstrate that actual confusion has occurred and that a likelihood of confusion exists. [106] While the anecdotal evidence from Bartlett's testimony is relevant—and not disputed by any other evidence— its "weight is lessened" by a high volume of business transacted by the parties in the soccer space. [107] Had Nike had truly "swamped" the

---

[102] *Amicus Commc'ns, L.P. v. Hewlett-Packard Co.,* No. CIV.A.SA-98CA1176PMA, 1999 WL 495921, at \*15 (W.D. Tex. June 11, 1999) (examining whether a defendant undertook the use of a mark "with the plan to 'palm off' [the defendant's] goods as those of plaintiff's").

[103] R. Doc. 39 at pp. 19-20.

[104] R. Doc. 39 at pp. 19-20.

[105] *Id.* at p. 88.

[106] *See Holiday Inns, Inc. v. Holiday Out In Am.*, 481 F.2d 445, 449 (5th Cir. 1973); *Amicus Commc'ns, L.P. v. Hewlett-Packard Co.*, No. CIV.A.SA-98CA1176PMA, 1999 WL 495921, at \*16 (W.D. Tex. June 11, 1999) (holding that actual confusion, while not required, is the best evidence of a likelihood of confusion "…only if the evidence of actual confusion is relatively significant").

[107] *Rex*, 80 F.4th at 627 (citing *Sun Banks of Fla., Inc. v. Sun Fed. Sav. & Loan Ass'n*, 651 F.2d 311, 319 (5th Cir. 1981) ("In determining the likelihood of confusion, however, a court must consider all of the evidence, including countervailing circumstances which lessen the impact of asserted instances of confusion.")).

market in which the Plaintiff was selling its goods, more incidents of actual confusion would have occurred and thus should have, or would more likely have, been entered into evidence during the hearing.[108] The Court cannot speculate on that. Relying on the record evidence, the Plaintiff has not shown significant actual confusion.

Lastly, as to the degree of care exercised by potential purchasers, courts look "to both the kind of goods or services offered and the kind of purchasers."[109] "Where items are relatively inexpensive, a buyer may take less care in selecting the item, thereby increasing the risk of confusion ... However, a high price tag alone does not negate other [digits of confusion], especially if the goods or marks are similar."[110] Here, while the goods are relatively similar, Nike's products bearing the "Total 90" mark are not inexpensive and also contain other marks, including the Nike swoosh logo.[111] Additionally, consumers interested in soccer are likely to be selective about their equipment and goods purchased, especially when the price is not cheap. Therefore, the Court finds that the Plaintiff has not shown a likelihood of success regarding this digit.

While the Plaintiff has shown a likelihood of success on some of the digits and has failed to show as such on others, the Court, having weighed the digits of confusion as required by binding Fifth Circuit jurisprudence, finds that the Plaintiff has failed

---

[108] *Id.*
[109] *Id.*
[110] *Id.* (quoting *Streamline*, 851 F.3d at 458).
[111] *See* R. Doc. 39 at p. 87 ("The Nike Total 90 product comes in a Nike box. There is a beautiful Nike Swoosh on the side of it. I have another just demonstrative product of a Nike Total 90 shirt. Again, it's Nike hangtags and there's a Nike Swoosh on that."); *see also Cohn v. Petsmart, Inc.,* 281 F.3d 837, 842 (9th Cir. 2002) ("The emphasis on these housemarks 'has the potential to reduce or eliminate likelihood of confusion.'") (quoting 3 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23:47 (4th ed.1997)).

to show a substantial likelihood of success on its trademark infringement claim. Further, and importantly, the Plaintiff failed to carry its burden to show actual confusion, which constitutes the "best evidence of a likelihood of confusion."[112] Even if the Plaintiff had demonstrated that it was the senior user of the mark—which it did not—the Plaintiff has failed to meet its burden of demonstrating a substantial likelihood of success on its claim of trademark infringement, and thus the Court must deny its request for a preliminary injunction. Having found that the Plaintiff has not met its burden as to the first prong of a preliminary injunction analysis, the Court need go no further; however, the Court finds it appropriate to address the second preliminary injunction factor: a substantial threat of irreparable harm.

### 2. Substantial Threat of Irreparable Harm

The Plaintiff argues that it would suffer irreparable harm should a preliminary injunction not be issued due to the World Cup being played in the United States[113] this summer. The Plaintiff contends that because the "World Cup is going to be a huge event this coming summer and it's going to take over the United States," it would suffer irreparable harm should Nike continue to sell products in their Total 90 product line.[114] Defendant Nike responds that "[t]here is no evidence of irreparable

---

[112] *Future Proof Brands, L.L.C. v. Molson Coors Beverage Co.*, 982 F.3d 280, 289 (5th Cir. 2020).

[113] The Court takes judicial notice of the fact that the 2026 FIFA World Cup will feature matches in Canada and Mexico, in addition to those taking place in the United States. *See* FIFA, https://perma.cc/S4WK-2QPL.

[114] R. Doc. 39 at p. 67. Further, to the extent that the Plaintiff relies on the current World Cup soccer games taking place in the U.S. to support irreparable injury, the Court understands the World Cup more as an opportunity for financial gain rather than irreparable harm. The Court does not mean to express any disapproval of financial gain.  Instead, the Court reiterates that irreparable harm, by its very definition, cannot be compensated by money.

harm in light of the very lengthy delay" in filing the present suit and motion for injunctive relief.[115]

Pursuant to the Lanham Act, "a plaintiff seeking a preliminary injunction against infringement 'shall be entitled to a rebuttable presumption of irreparable harm ... upon a finding of likelihood of success on the merits.'"[116] Having found that the Plaintiff has not demonstrated a substantial likelihood of success on the merits of its trademark infringement claim, the Court finds that this rebuttable presumption does not apply because the presumption is contingent on a finding of a likelihood of success.

Further, the Court finds that the Defendant has rebutted the presumption under the Lanham Act due to the delay between the alleged infringement and filing suit in this Court. When seeking a preliminary injunction, the party requesting it "must generally show reasonable diligence."[117] "[D]elay in seeking a remedy is an important factor bearing on the need for a preliminary injunction."[118] "[A] substantial period of delay" demonstrates "that there is no apparent urgency to the request for injunctive relief."[119] Record evidence demonstrates that Plaintiff first contacted

---

[115] *Id.* at p. 90.

[116] *Whirlpool Corp. v. Shenzhen Sanlida Elec. Tech. Co., Ltd.,* 80 F.4th 536, 546 (5th Cir. 2023) (quoting 15 U.S.C. § 1116)..

[117] *Benisek v. Lamone*, 585 U.S. 155, 159, 138 S. Ct. 1942, 1944, 201 L. Ed. 2d 398 (2018).

[118] *W. Sur. Co. v. PASI of LA, Inc.*, 334 F. Supp. 3d 764, 799 (M.D. La. 2018) (quoting *Gonannies, Inc. v. Goupair.Com, Inc.,* 464 F. Supp. 2d 603, 609 (N.D. Tex. 2006)).

[119] *High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1557 (Fed. Cir. 1995); *see also Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985) ("Preliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights. Delay in seeking enforcement of those rights, however, tends to indicate at least a reduced need for such drastic, speedy action."); *Boire v. Pilot Freight Carriers, Inc.,* 515 F.2d 1185, 1193 (5th Cir. 1975) (affirming the denial of injunctive relief after plaintiff waited three months to seek injunctive relief).

counsel for Defendant about its registration of "Total90" in December 2024 after the Plaintiff registered the mark.[120] Nearly eleven months later, and after numerous communications seeking monetary payment in exchange for abandoning its registration of the "Total90" mark, the Plaintiff filed the present suit and moved for the instant preliminary injunction.[121] While the Plaintiff has argued that there still would be irreparable harm should an injunction not be issued due to the immediacy of the World Cup in the United States and the potential for the "Total90" brand to grow organically in the next year,[122] such potential harm does not ameliorate the fact that it waited nearly a year to seek injunctive relief from this Court. This fact significantly undermines the Plaintiff's argument that such harm is irreparable.

For those reasons, even if it had shown that there was a substantial likelihood of success on its trademark infringement claim, the Court finds that the Plaintiff has not met its burden to demonstrate that there is a substantial threat of irreparable harm should a preliminary injunction not issue in this case. For that additional reason, the Court must deny the Plaintiff's motion.

---

[120] R. Doc. 4-3, *Declaration of Michael Harris*, at ¶2.

[121] *See* R. Doc. 4-7 at p. 3 ("My client holds a federal registration and remains willing to resolve this matter amicably. We would much prefer to negotiate a mutually beneficial agreement rather than escalate") and at p. 11 ("I remain committed to a peaceful and mutually beneficial resolution, as you've suggested is possible, and want to ensure my approach doesn't inadvertently trade on Nike's goodwill"); *see also* R. Docs. 4-4, 4-8, and 4-9. While Plaintiff maintains that the Court should not consider the pre-suit communications between the parties, the Court finds them relevant in discussing irreparable harm.

[122] R. Doc. 39 at p. 78 ("And let's say we win at the end of all this and we get three, ten million dollars, whatever it is. That is not the same as growing a brand in the heat of the World Cup. That could be a much, much larger number that is going to overstep all of the amount that was spent by both parties if it's done properly, which is what Mr. Bartlett has set up to happen during the World Cup.").

### 3. The Remaining Preliminary Injunction Factors

Because the Court has found that the Plaintiff has not borne its burden of showing (1) a substantial likelihood of success on the merits or (2) a substantial threat of irreparable harm should an injunction not be issued, the Court need not consider the remaining injunctions for the granting of a preliminary injunction: whether the balance of equities weigh in movant's favor and whether the public interest is disserved by an injunction.[123]

## IV.    CONCLUSION

For the foregoing reasons, because the movant has failed to carry its burden to prove each of the elements of a preliminary injunction,

**IT IS HEREBY ORDERED** that Plaintiff Total90, LLC's Motion for Preliminary Injunction is **DENIED**.

New Orleans, Louisiana, June 22, 2026.

**WENDY B. VITTER**
**United States District Judge**

---

[123] *See Perez v. City of San Antonio*, No. 23-50746, 2025 WL 3559986, at *17 (5th Cir. Dec. 12, 2025) (The movant bears "the burden of showing that they satisfy each of these elements.").